THE VANDERBILT.

1. Where the usage in navigating a river is, that both ascending and descending vessels shall keep to the right of the centre of the channel,—which is the usage in the River Hudson,—the omission to comply, seasonably, with that regulation, if the omission contributes to the collision, is a fault for which the offending vessel and her owners must be responsible.

---

* 17 Howard, 152.

2. Compliance with such a usage is required in all cases where the course of a vessel is such that, if continued, there would be danger of collision with other vessels navigating in the opposite direction.

8. Unless precautions are seasonable, they constitute no defence against a charge of collision, although they may be in form such as the rules of navigation require.

4. Objections to the amount of damages, as reported by a commissioner and awarded by the admiralty court, will not be entertained in this court in a case of collision where it appears that neither party excepted to the report of the commissioner.

APPEAL from the Circuit Court for the Southern District of New York.

On the morning of May 16th, 1863, the steam-tug Hubbard was slowly descending the *west* side of the Hudson River, here one thousand or more feet wide. She was about one hundred and seventy-five feet from the shore, and had in tow four canal-boats, of which the Canisteo was one. She was now opposite the lower part of Troy, a city on the east side of the river. At the same time the Vanderbilt, a large steamer, regularly plying on the stream, was coming up it, and was making for her dock about a mile off, in the upper part of Troy. But she was on the west side of the channel also, and had been sailing on that side of it. The morning had been clear, but a fog-bank settling itself at that part of the river, both vessels as they entered it were unable to see ahead. Running each on its course, they suddenly discovered one another, the two in immediate proximity. There was apparently no exception to be taken to the manœuvres of navigation of either vessel in the circumstances. But coming thus, unawares, on each other, the Vanderbilt, in spite of all efforts made at so late a moment, struck the Canisteo, and being much the larger vessel, sunk her at once. No difficulty had existed as to sea room for the steamer to pass to the right and east of the descending tow. The owner of the Canisteo now libelled the Vanderbilt in the District Court for the Southern District of New York, where a decree was given for the libellant; that court considering that the Vanderbilt was " disproportionately out of the channel toward the west shore." On reference to a commissioner,

the damages were fixed at $7020. An appeal was taken to the Circuit Court; no exception being taken in either court to the amount of damages. On the appeal the following opinion was delivered by

NELSON, J. The point pressing on the steamer is that she was too far to the west of the channel of the river, and, therefore, out of her proper course. This view was taken by the court below, and upon it a decree was rendered for the canal-boat. We are inclined to concur in this result. The west side is the natural and ordinary track for descending vessels, and the Vanderbilt, we think, was bound to take notice of this fact, and to have kept nearer to the middle of the river. She had no right to act upon the idea that, the descending boat would take that course, and expect her to pass to the left or starboard, between her and the west shore. What makes the case more marked in this respect, is the fact that the steamer's dock was on the east shore, some mile above the place of collision.

DECREE AFFIRMED.

The case being now here for review, was submitted by *Mr. Charles Jones, for the appellant,* who contended that the decree was wrong in general result, and by *Mr. S. P. Nash, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

The libel was filed in the District Court by the owner of the canal-boat called the Canisteo against the steamer C. Vanderbilt in a cause of collision, civil and maritime. Employment of the Vanderbilt was to transport passengers and freight between the cities of New York and Troy, upon the Hudson River, and the libel alleges that the canal-boat was employed in transporting freight between the former city and divers ports and places on the same river and the Erie Canal. Allegations of the libel are, that the collision occurred on the sixteenth day of May, 1863, on the west side of the river, nearly opposite the arsenal at Troy. Lading of the canal-boat was corn and flour, and the proofs showed that she was sunk by the collision, and that the boat and

cargo became a total loss. Charge in the libel is, that the disaster and loss were wholly occasioned by the carelessness and negligent and unskilful management of those intrusted with the navigation of the steamer.

Parties were fully heard in the District Court, and the district judge being of the opinion that the charge in the libel was true, entered a decree for the libellant, and sent the cause to a commissioner to ascertain the amount of damages.

Subsequently the commissioner made his report, and neither party excepting to the same, it was confirmed by the court, and a final decree entered for that amount in favor of the libellant. Appeal was taken by the claimants to the Circuit Court, where the parties were again heard upon the same evidence, and the circuit judge being of opinion that there was no error in the record, affirmed the decree, and thereupon the claimants appealed to this court.

1. When the collision took place the canal-boat, with three others, was in tow of the steam-tug O. C. Hubbard, and she was proceeding down the river, having left her berth, at Troy, on the west side of the river, at six o'clock in the morning. None of the boats in tow carried any motive power, and the testimony shows that the Canisteo was lashed to the larboard side of the steam-tug, with one of the other three fastened to her larboard side, and the other two were arranged in the same way on the starboard side of the steam-tug, which constituted the necessary motive power. Berth of the Vanderbilt, at Troy, was on the east side of the river, and she was on her return trip, from Albany, with passengers and freight.

Although there was some fog when the tug, with the four canal-boats in tow, left the wharf in the morning, yet the witnesses testify that objects could be seen at the same time on both sides of the river, and that it was good weather. Heavy rains had caused the water to rise eight or ten feet above the ordinary low water in summer, which very much increased the breadth of navigation, as the largest vessels could safely pass close to the shore. Speed of the steam-tug as she was proceeding down the river on the western side

was not much greater than the current of the river, which did not exceed four or five miles an hour. Usual pathway of steamers ascending the river is on the east side of the centre of the channel, but the Vanderbilt came up on the western side in the usual pathway of descending boats and vessels, and the testimony proves that she was moving through the water at nearly double the rate of the steam-tug with the tows. Length of the canal-boats was much greater than that of the steam-tug; and the proofs show that the Vanderbilt struck the Canisteo on her starboard bow six or eight feet from the stem. Plain inference from the position and character of the blow is, that the steamer had ported her helm, and when the collision occurred was steering towards the east side of the river.

Just before the collision took place both vessels passed into a dense fog, which rested on the water, and the appellants contend that the state of the weather was such that the steam-tug, with her tows, ought not to have left her berth and started down the river. But the weight of the evidence shows that the proposition involved in the defence is not well founded. On the contrary, it is quite clear from the evidence that the indications as to the weather at the time those in charge of the tug and tows decided to start on the trip, fully justified their determination. Suggestion is made that the tow was a large one, but it was well arranged, and the boats, two on each side of the steam-tug, being well over on the western side of the channel, were proceeding slowly down the river in their proper pathway. Ample room was left for the steamer to have gone to the right, as the river there, at that stage of the water, is nearly a thousand feet wide. Steamers may doubtless ascend on either side of the river in the daytime when the view is not obstructed or obscured by fog, but it was a fault in the steamer, when she found she was approaching a fog-bank, that she did not port her helm and leave the accustomed pathway of descending boats and vessels. Witnesses on board the steamer testify that the whistle was blown to warn descending boats, and that orders were given to stop and back as soon as the steam-tug and

tows were discovered, but it is quiet evident that all these precautions were too late, as the collision was then inevitable. Precautions not seasonably taken afford no defence against the charge of negligence in cases of collision where it appears that the disaster might have been prevented by earlier action. Steamers approaching each other from opposite directions are required by the general rules of navigation, as well as by the recent act of Congress, to port their helms and pass to the right, but it is obvious that one or both may omit to comply with the requirement until their proximity is so close that a compliance is wholly inadequate to accomplish any valuable purpose.

Proofs in this case show that the Vanderbilt ported her helm, but the change of her course was so late that it insured the collision which might, perhaps, have been avoided if she had made an effort to pass the descending boats on the starboard side next to the western shore. The great fault was that she did not change her course and pass to the eastern side of the channel before entering the fog-bank, as all the witnesses agree she might have done without danger or serious inconvenience. Electing, as she did, to continue her course up the river on the western side, where those in charge of her navigation knew she was liable to meet descending boats, she was bound to exercise great care and caution; and it is clearly proved that she failed to comply with requirement until it was too late to prevent the disaster.

Objection is made to the amount of the damages awarded, but the objection cannot prevail, as no exceptions were taken to the commissioner's report in the District Court. Such objections will not be entertained in this court unless the claimant gave notice of the same in the court below by appropriate exceptions to the commissioner's report. Parties should present their objections at the stage of the litigation when the errors, if any, may be corrected without inconvenience and unnecessary expense; and if they fail to do so without just excuse, they must be understood as having acquiesced in the decision of the court.

DECREE AFFIRMED WITH COSTS.