## The Ping-On v. Blethen and others.

*(Circuit Court, D. California. 1882.)*

1. Jurisdiction—Consular and Ministerial Courts—Appeal from.

The whole statute upon the subject of the consular and ministerial courts of China and Japan must be construed together, and, if possible, so that there shall be no conflict between its various provisions. A complete and harmonious system for the exercise of appellate jurisdiction from those courts has been provided, and sections 4092 and 4093 prescribe the jurisdiction. By the former, appeals to the minister are limited to cases involving amounts not less than $500 and not exceeding $2,500. By the latter, appellate jurisdiction is given to the United States circuit court for the district of California in "any final judgment in the consular court wherein the amount of the judgment, exclusive of costs, exceeds $2,500," etc. The special office and purpose of those two sections is to prescribe the jurisdiction. Section 4107 only prescribes, to a certain extent, the conditions and limitations under which the jurisdiction pro vided for by the previous sections shall be exercised. Its provisions must be construed in subordination to the system and provisions of the sections specially defining the jurisdiction. So construing section 4107, appeals to the minister are allowed by its provisions under the circumstances therein indicated, only in the class of cases over which appellate jurisdiction is given to that officer by section 4092, and that in any case wherein the judgment exceeds $2,500, etc., an appeal lies to the circuit court for the district of California.

2. Appeal—Security.

A sum of money deposited in the registry of the consular court in lieu of a bond is sufficient security on an appeal to the circuit court, where the deposit was taken without objection.

3. Admiralty—Cross-Libel.

It is not the office of a cross-libel to enforce a new subject-matter introduced into the litigation by strangers to the original suit, and thus create a new liability. The fifty-third admiralty rule of the supreme court clearly indicates that parties other than the original parties cannot be joined either as libellants or respondents in a cross-libel.

4. Practice—Objections to Misjoinder of Parties.

It is too late after a cause has been fully heard, and after appellants have taken their chances of obtaining a favorable decree, for them to object that they were sued in the cross-libel, when they were not parties in the original suit, where the cause was tried on its merits; all parties, so far as appears, submitting to the jurisdiction.

5. Collision—Lookout.

Where there were three experienced mariners on the poop deck, with an unobstructed view all round, the absence of a lookout will not be held to contribute to the collision.

6. Same—Converging Course—Error in Porting Helm.

If a vessel's green light has been sighted by the steamer on her starboard bow, and the red light not sighted, she is clearly wrong in porting helm; the vessels not being end on or nearly end on to each other, within the rule requiring the porting of the helm.

**7. SAME—OBSCURED LIGHTS—DUTY OF STEAMER—SIGNAL WHISTLE.**

Where by reason of smoke the side lights of the vessel could not be discerned, it is the duty of the steamer to blow her whistle and slacken her speed, or stop until the course of the vessel could be ascertained.

In Admiralty.

Before SAWYER, C. J., and HOFFMAN, D. J.

HOFFMAN, D. J. This case comes before us on appeal from a decree rendered by the United States consular court at Shanghai, China, on a cross-libel filed by the appellees against the appellants.

A preliminary objection to the jurisdiction of this court must first be considered.

The Revised Statutes, §§ 4092, 4093, 4094, and 4109, in substance provide that in all cases where the matter in dispute exceeds $2,500, an appeal from the final judgment of any consular court shall be allowed to the circuit court for the district of California.

In cases where the matter in dispute exceeds $500, and does not exceed $2,500, the appeal lies to the United States minister. The latter has also original jurisdiction in cases where a consular officer is interested, either as a party or a witness, and from his final judgment in such cases an appeal lies to the circuit court for the district of California, when the amount in dispute, exclusive of costs, exceeds $2,500.

As the amount in dispute in the present cause exceeds $2,500, exclusive of costs, the right to appeal to this court would seem, under these provisions, to be clear and unquestionable.

It is contended that they are modified and controlled by the provisions of section 4107. That section in substance provides:

(a) "That the consul shall have jurisdiction in all cases where the damages demanded do not exceed $500; and, in such cases, if he sees fit to decide the same without aid, his judgment shall be final." (b) "That in any case he may, and when the damages demanded exceed $500 he must, summon to sit with him on the hearing of the cause not less than two nor more than three citizens of the United States," etc. (c) "If the consul and his associates concur in opinion, the judgment shall be final; but if either of the associates differ in opinion from the consul, either party may appeal to the minister." (d) "The consul shall, in all cases, give judgment in the case; and, if no appeal is lawfully claimed, the decision of the consul shall be final."

One of the associates in the case at bar differed in opinion from the consul. It is claimed that under section 4107 the appeal should have been taken to the minister. It is obvious that if this be the legal effect of the provisions of section 4107, the provisions of sections

4092, 4093, 4094, and 4109 are not merely modified and restricted, but they are in great part abrogated and repealed, and the various sections of the act are irreconcilably contradictory and conflicting. If the appeal lies to the minister, exclusively, in all cases where the associates do not unanimously concur in opinion with the consul, then the provisions of section 4093, which allow an appeal to the circuit court for the district of California from *any* final judgment in *any* consular court when the matter in dispute, exclusive of costs, exceeds $2,500, are repealed or become inoperative; for, if the associates differ, the appeal is to the minister, and if they concur, the judgment of the consul is final. The provisions of sections 4094, 4109, and 4092 clearly indicate the system congress intended to adopt. In suits for $500 or less the decision of the consular court is final, unless the consul sees fit to call in associates, and they differ in opinion. In suits for more than $500, and not more than $2,500, an appeal lies to the minister, whose judgment is final. In suits for more than $2,500 the appeal lies to the circuit court for the district of California, and a similar appeal lies from the final judgment of the minister, in the *exercise of original jurisdiction,* when the amount involved exceeds $2,500. But this original jurisdiction is confined to cases where the consul is interested either as party or witness.

It thus appears that congress has seen fit to withhold, both from the consular court and from the minister, final jurisdiction in all cases where the matter in dispute exceeds $2,500, exclusive of costs, and to provide in such cases for an appeal to the circuit court for the district of California. But if the provisions of section 4107 have the effect contended for, this system is fundamentally changed; for not only is the appeal from the consular court withheld in all cases where the associates concur with the consul, but when they differ the appeal is to the minister exclusively, and from his judgment there is no appeal; such appeal being allowed only from judgments given by him in the exercise of *original jurisdiction.*

It is suggested that these differences and discrepancies may be avoided by construing the words "either party may appeal to the minister" as permissive merely; and that the right of appeal to the circuit court, given by section 4093, is preserved. But this suggestion seems inadequate to meet the difficulties of the case. If an appeal can be taken in all cases involving more than $2,500 to the circuit court, and if either party may appeal to the minister, to which is the appeal in case parties disagree? If one prays an appeal to

the circuit court, and the other to the minister, how is the consul to determine which shall be granted? But supposing this embarrassment overcome, the greater difficulty still remains of reconciling the provision that the consul's judgment shall be final when his associates concur with him in opinion, with the provisions giving an appeal to the circuit court, *from any judgment or decree of a consular court, where the matter in dispute exceeds the sum of* $2,500. Section 4093. The only plausible way of reconciling these seemingly contradictory provisions, which occurs to us, is to construe the provisions of section 4107, which make the judgment of the consul final when concurred in by his associates, and allowing an appeal to the minister when there is a difference of opinion, as referring only to cases in which the matter in dispute does not exceed $2,500. The provisions of the act would thus be made harmonious and consistent, and its principal feature preserved, viz.: to make the judgments of the consul or minister final in all cases where the matter in dispute does not exceed $2,500, and to allow an appeal to the circuit court in all cases where it is in excess of that amount.

The whole statute upon the subject of the consular and ministerial courts of China and Japan must be construed together, and, if possible, so that there shall be no conflict between its various provisions. A complete and harmonious system for the exercise of appellate jurisdiction from those courts has been provided, and sections 4092 and 4093 prescribe the jurisdiction. By the former, appeals to the minister are limited to cases involving amounts not less than $500 and not exceeding $2,500. By the latter, appellate jurisdiction is given to the United States circuit court for the district of California in "any final judgment in the consular court wherein the amount of the judgment, exclusive of costs, exceeds $2,500," etc. The special office and purpose of those two sections is to prescribe the jurisdiction. Section 4107 only prescribes, to a certain extent, the conditions and limitations under which the jurisdiction provided for by the previous sections shall be exercised. Its provisions must be construed in subordination to the system and provisions of the sections specially defining the jurisdiction. So construing section 4107, we have no doubt that appeals to the minister are allowed by its provisions under the circumstances therein indicated, only in the class of cases over which appellate jurisdiction is given to that officer by section 4092, and that in any case wherein the judgment exceeds $2,500, etc., an appeal lies to the circuit court for the district of California. The objection to the jurisdiction is overruled.

It is further contended that the appeal should be dismissed because no sufficient security was given by the appellant. No bond was in fact given, but the sum of $6,000 was deposited in the registry of the consular court in lieu thereof. Section 4117 of the Revised Statutes provides that the minister shall, with the advice of the consul, prescribe "the security which shall be required of a party who appeals from the decision." The deposit was taken without objection. It is to be presumed that it was prescribed by the minister with the advice of the consul. It is of the highest order, and far more certain than a bond, which may prove of no value, and which the statute does not require. The objection is overruled.

It is contended on the part of the appellant that the decree should be reversed and the cross-libel dismissed for misjoinder of respondents.

The original libel was filed by Clement Phinney Blethen, owner of the American brig Condor, against the steamer Ping-On, to recover damages in a cause of collision. To this libel Andrew Allison McCaslin, claimant of the Ping-On, filed an answer on the twenty-fourth of December, 1879. On the nineteenth of January, 1880, McCaslin applied to the court for leave to file a cross-libel, which, being granted, he, on twenty-third of January, filed a cross-libel against Blethen, as the original libellant, and also against him, C. H. Wells, and others, as partners in the Shanghai Tug-boat Association, the owner of the steam-tug Fokelin, which, at the time of the collision, had the Condor in tow.

Blethen and the Shanghai Tug-boat Association appeared and filed their answer to the cross-libel. The two cases were tried together, and a decree was entered on the cross-libel against Clement Phinney Blethen and C. H. Wells, as part owners of the steam-tug Fokelin, and partners in the Shanghai Tug-boat Association. No decree whatever was entered in the original suit. The appeal now before us is from the decree on the cross-libel.

It is obvious that the cross-libel was filed, not against the libellant in the original libel, as owner of the Condor alone, but against him and others trading under the style of the Shanghai Tug-boat Association, as the supposed owners of the Fokelin, by whose fault, in part, the collision is charged to have occurred. The tug-boat association, and the persons composing it, were thus strangers to the original suit, and a new subject-matter was introduced into the litigation, viz., the liability of the Fokelin and her owners for the damage sustained by the Ping-On.

It was not the office of a cross-libel to enforce this liability.

"Whether the controversy pending is a suit in equity or in admiralty, a cross-bill or libel is a bill or libel brought by a defendant in the suit against the *plaintiff* in the same suit, or against other defendants in the original suit, or against both, touching the matter in question in the original bill or libel. It is brought in the admiralty to obtain full and complete relief to all parties as to the matters charged in the original libel; and in equity the cross-bill is sometimes used to obtain discovery. New and distinct matters, not included in the original bill or libel, should not be embraced in the cross-suit, as they cannot be properly examined in such suit, for the reason that they constitute the proper subject of a new original bill or libel. Matters auxiliary to the cause of action set forth in the original libel or bill may be included in the cross-suit, and no others, as the cross-suit is in general incidental to and dependent upon the original suit." *The Dove*, 91 U. S. 385; *Shields* v. *Barrow*, 17 How. 145; 'Story, Eq. Pl. § 389.

The original libel was founded on the alleged negligence of the Ping-On, whereby the Condor was sunk. It was perfectly competent for the owners of the Ping-On to seek affirmative relief by cross-libel against the owners of the Condor, and the decree would have determined which of the two vessels was in fault. But the cross-libel in this case not only impleads strangers to the original suit, but it seeks to enforce their liability as the owners of the steam-tug Fokelin; and the decree rendered was against the respondents as such owners, and not against the master and owners of the Condor as such.

The fifty-third admiralty rule of the supreme court clearly indicates that parties other than the original parties cannot be joined either as libellants or respondents in a cross-libel.

"Whenever a cross-libel is filed upon any *counter-claim* arising out of the same causes of action for which the original libel was filed, the respondents in the cross-libel shall give security, in the usual form, to respond in damages as claimed in the cross-libel, unless the court, on good cause shown, shall otherwise direct, *and all proceedings upon the original libel shall be stayed until such security shall be given.*" Admiralty rule 53.

It was surely not intended by this rule to make the right of the original libellant to proceed in his suit to depend upon the ability or willingness of strangers, whom the respondent might charge with negligence, to give security to answer his demand, nor to compel the libellant himself to become responsible for their negligence or abandon his suit. It is objected that it is too late to raise this objection for the first time in the appellate court. There is no doubt that, as a general rule, parties are required to present their objection at the stage of the litigation when the errors, if any, may be corrected without inconvenience or unnecessary expense. If they fail to do so, they

will, in the appellate court, be deemed to have waived them. *The Vanderbilt,* 6 Wall. 230; *The Commander in Chief,* 1 Wall. 52.

It is contended by the appellants that the objection *was* taken in the court below. The eighth article of the answer avers that the Shanghai Tug-boat Association ought not to have been made parties to the suit. But this exception, if such it can be called, points very vaguely to the objection now relied on. It may mean merely that the tug-boat association ought not to have been sued because they were not liable; or that they ought not to have been joined in a suit against the master and owners of the Condor. It does not state with any distinctness that they ought not to have been sued on a cross-libel because they were not parties to the original libel. The record does not disclose any presentation of this objection to the court, nor any ruling upon it, nor any exception taken to such ruling. The cause was tried on its merits; all parties, so far as appears, submitting to the jurisdiction. Had the point been presented we must presume that the court would have decided it correctly. In that case the cross-libellants could, without inconvenience or considerable expense, have dismissed their cross-libel, and set up the same matter in an original libel. It is quite possible that it was not thought necessary to drive them to this merely formal change of procedure. We think it too late, after the cause has been fully heard, and after the appellants have taken their chances of obtaining a favorable decree, for them to raise the objection, substantially for the first time, in this court.

We proceed to consider the merits of the cause:

On the twenty-first of November, 1879, the Condor, a brig of 257 tons, was on a voyage from the port of Nagasaki, Japan, to the port of Shanghai, China. She was at anchor on the Yang-tse river, two or three miles below the Lismore wreck light, and some distance from where the Woosung or Wangpoo river flows into the Yang-tse-kiang. The steam-tug Fokelin, on her way to take her in tow, passed the Woosung light-house about 5 P. M., and on reaching the brig, which was riding to the flood tide, made fast to her port side, and turned her around on a starboard helm. The two vessels then proceeded towards their port of destination, having the Lismore light slightly on the port bow, and the red sector of the Woosung light a little on the starboard bow, until, when within about three-eighths or half a mile from the Lismore light, the white and green lights of a steamer, distant from half a mile to a mile, and bearing from two to two and a half points on the starboard bow, were discovered. The steamer

proved to be the Ping-On, which had left Shanghai on the same after-noon.    No other vessel or light was in sight.    The tug and tow con-tinued on a starboard helm, which was a course divergent from that of the Ping-On, as indicated by the exposure of her green light.    It was soon perceived by the tug and tow that the steamer was chang-ing her course.    The cabin lights aft were gradually shut out, and the red light exposed, until very shortly before the collision all three of her lights came in view.    The tug and tow, on perceiving this change of course, blew two whistles to indicate that she was on her starboard helm.    To this signal the steamer replied by one whistle, indicating that she was porting.    She continued to port until both vessels reached the immediate vicinity of the Lismore light, when the steamer struck the Condor stem on, nearly amid-ships, and at nearly a right angle.    The Condor almost immediately sank.

The consular court adjudged that the whole liability for the dam-ages, both to the Condor and the Ping-On, rested on the tug-boat Fokelin and her owners, and it made a decree in favor of the Ping-On against the respondents to the cross-libel filed by the owners of the steamer.    The grounds of this decision, as disclosed in the judg-ment of the consul, are (1) that the tug and tow did not have a proper lookout; (2) that they were on the wrong side of the chan-nel; (3) that they should have ported instead of starboarding their helms.

1. The first point, though mentioned in the judgment, can hardly be said to have been considered as a separate and independent ground of decision.    The court, being of opinion that the tug and tow were on the wrong side of the channel, considers that there should have been a lookout forward, in view of "the hazard of their situation and surroundings."

The proofs, we think, show that no lookout was stationed forward on the top-gallant forecastle; but they also show beyond controversy that on the poop deck of the Condor were three experienced mariners, viz., the master of the Condor, the master of the tug, and a pilot who was on board as a passenger.    All these agree that they kept a vigi-lant lookout, and that their position gave them an unobstructed view on all sides, the vessel not being under sail.    The Ping-On was, in fact, observed when at a distance of one-half or three-quarters of a mile, and in ample time to enable the tug to adopt, seasonably, the proper measures to avoid a collision.    It is therefore, we think, evi-dent that the absence of a lookout did not contribute, and could not have contributed, to the accident, and that the Ping-On was seen from

the Condor's poop as soon as she could have been discerned by a lookout forward, and even sooner, if the mate of the Condor, who was a witness for the libellant, is to be credited. See *The Dexter*, 23 Wall. 69–74; *The Farragut*, 10 Wall. 337; *The America*, 92 U. S. 436; *N. Y. & B. T. Co.* v. *P. & S. S. S. Co.* 22 How. 471; 1 Pars. Ship. & Adm. 577; *The Shirley* v. *The Richmond*, 2 Wood. 61.

2. Were the tug and tow in fault in being on the southerly side of the channel? It is stated, in the judgment of the consul, that the "weight of evidence is clear that it is the custom of this port for all vessels coming in and going out, in that part of the river where the collision occurred, to pass on the starboard side of the channel; *i. e.*, incoming vessels on the north and outgoing vessels on the south side." We have carefully examined the testimony on this point. We are unable to concur in the conclusions of the consul. There seems, undoubtedly, to be a general practice or understanding such as is stated by the consul, but it appears to be confined to cases where the channel is not clear, or when the lights of approaching vessels are in sight.

Several experienced ship-masters and pilots, having no interest in the case, testify: "If the channel is clear you can go any side of the channel. If nothing is in the way, a vessel, after passing Lismore light, could please herself." Even Capt. McCaslin, master of the Ping-On, seems to admit the limitation of the rule contended for by the appellants: "I believe it is a rule to go on the right-hand side when there is any light in sight."

In the judgment of the consul, much reliance seems to be placed on a decision of Sir Edmund Hornsby, of the British court for Shanghai, in the case of *Hopewell* v. *The Annie Gray*. But in this case the collision occurred on the Woosung river, and not on the Yang-tse river, where the collision in the case at bar took place; and the learned judge, even as to that river, declines to "enter into the question whether there is any law or custom, of universal and invariable practice, which compels a vessel to keep a starboard shore;" and he places his decision on the ground that, "apart from any law, custom, or practice, good navigation required the Annie Gray to keep the Woosung side of the river." It is obvious that this decision can have little application to a collision occurring on the Yang-tse river. The opinion of the learned judge seems to afford some support to the contention of the respondents in this case. He observes: "While the assessors agree that it is open to a vessel to take any clear chan-

nel, they expressly dissent from the view that a clear channel is to be considered such when another vessel is approaching it, and would, in her ordinary course, enter it." If this view of the assessors be correct, and it seems to be approved by the learned judge, it follows that the tug and tow had a right to hold their course along the southerly shore, near which the Condor had been anchored, until, at least, the channel, by reason of the approach of another vessel, ceased to be *clear*; and their liability, if any, will attach, not because when the Ping-On was discovered they were on the wrong side of the channel, but because, *after* she was discovered, they failed to adopt proper measures to avoid the collision. In this view Capt. Dalrymple, one of the assessors summoned by the consul to assist him, concurs. In reply to interrogatory 7, he says: "When the Ping-On first sighted the Condor the Ping-On had a right to be where she was. When the Condor first sighted the Ping-On the *Condor had a right to be where she was. But, after passing the Lismore light and getting in mid-channel,* it is the custom to keep on the starboard and pass vessels on the port helm."

3. Was it the duty of the tug to have ported her helm when the green light of the Ping-On was sighted? The court below has applied to the case the provisions of rule 13, as construed by Dr. Lushington in the case of *The Fruiterer* v. *The Fingal,* Holt, 158. In that case Dr. Lushington observes: "Part of the evidence says they were within two points of meeting end on. I should consider, if they were within two points of meeting end on, they would fall within the latter part of the statement, nearly end on." But this construction of rules 11 and 13 having given rise to doubt and misapprehension, those rules were explained by an order in council, July 30, 1868. This order, after reciting the rules, and the fact that there has been doubt or misapprehension concerning the effect of the said two articles, declares that her majesty, by virtue of the powers, etc., etc., "is pleased to make the following additions to said regulations, by way of explanation of the said two articles." Articles 11 and 13, as originally adopted, were as follows:

"Art. 11. If two sailing-ships are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other."

"Art. 13. If two ships under steam are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other."

The additions by way of explanation are as follows:

"The said two articles, numbered 11 and 13, respectively, only apply to cases where ships are meeting end on, or nearly end on, *in such a manner as to involve the risk of collision.* They consequently do not apply to two ships which must, if both keep on their respective courses, pass clear of each other. The only cases in which the said two articles apply, are: when each of the two ships is end on, or nearly end on to the other; in other words, to cases in which, *by day,* each ship sees the masts of the other in a line with her own; and, *by night,* to cases in which each ship is in such a position as to see both the side lights of the other.

"The said two articles do not apply, *by day,* to cases in which a ship sees another *ahead,* crossing her own course; or, *by night,* to cases where the red light of one ship is opposed to the red light of the other; or where the green light of one ship is opposed to the green light of the other; or where a red light without a green light, or a green light without a red light, is seen ahead; or where both green and red lights are seen anywhere but ahead."

It would seem that nothing could be plainer or more explicit than this explanation of the practical application of the phrase, "nearly end on;" and that it removes, as was no doubt its design, the dangerous vagueness of the interpretation given to those words by Dr. Lushington.

Capt. Bowen, a witness for the libellants, recognizes, apparently without reference to the rule, or the exposition of it which has been cited, the impropriety of a vessel in the position of the Condor changing her course on seeing a green and a white light two points on the starboard bow. In reply to a question in which the position of the Condor and the bearing of the Ping-On's green and white lights are stated, he says: "My green light was exposed to his, and I should keep on, taking the left-hand bank of the channel, but only under these circumstances." This witness was called to prove the custom of incoming and outgoing vessels to keep to the starboard side of the channel; but he informs us that even if on the wrong side of the channel, with the Lismore light only one-half a point on his port bow, he would still hold his course on seeing the white and green lights of an approaching vessel two points on his starboard bow. "If I altered my course and got into collision I would consider myself in the wrong."

Capt. Dalrymple, one of the assessors, concurs substantially in the opinion of Capt. Bowen. In reply to the tenth interrogatory addressed to him by the consul he says:

" I think if the tug and Condor had ported their helms immediately after hearing the Ping-On's whistle announcing that she was porting, there would have been a collision, and I should have thought the Condor in the wrong in doing so, as there was not distance enough to have cleared the Ping-On."

We are of opinion that whether the question be determined by the provisions of rule 13, as explained by the order in council, or by the general rules of good navigation, or by the evidence given by experts, the tug and tow were not in fault in not porting when the Ping-On's green light was sighted; and as she was not in fault in respect to lookouts, or if in fault the fault in no way contributed to the accident; and as no fault can be imputed to them in taking the southerly side of the channel,—they must be acquitted of all blame, and the decree appealed from must be reversed. As this was the only decree entered in the cause, and the appeal from it the only appeal taken, it is not in our power to enter any decree in favor of the Condor and against the Ping-On.

It may not be improper, however, to make some observations with regard to the liability of the latter:

If we are right in considering the tug and tow free from fault, the collision must be attributed to the fault of the Ping-On, or to inevitable accident.

(1) The evidence, we think, shows that if the Ping-On had held her course the vessels would have passed clear of each other.

(2) If the Condor's green light had been sighted by the steamer on her starboard bow, and the red light not sighted, she was clearly wrong in porting her helm, the vessels not being "end on, or nearly end on," to each other within the meaning of the rule.

If by reason of the smoke neither of the side lights of the tug and tow could be discerned, the steamer had no right to assume that they were approaching end on, or nearly end on, and on that assumption to port her helm. It was her duty to blow her whistle and to slacken her speed, (eight miles per hour,) or stop until the course of the approaching vessel could be ascertained. Not knowing what indications her lights presented to the other vessel, she had no right to change her course to the starboard, as by blindly so doing she might, as in fact she did, bring about a collision; and to do so without signaling the other vessel aggravated the fault. On this point the decision in the case of the *Rona and Ava*, 5 Mar. Law Cas. 183, is directly applicable. Sir Barnes Peacock, delivering the judgment of the court, says:

"It appears to their lordships that in the construction of the regulation he was mistaken. The vessels were not, at that time, according to his own showing, end on, or nearly end on, within the meaning of the rule. It appears to their lordships that when he first saw the smoke, and had reason to *believe* it was caused by a steamer, he ought to have slackened his speed, for he could not

tell whether the steamers were end on, or nearly end on, or whether they were passing or crossing, or at what rate of speed the Rona was going. * * * If the Ava, when she first saw the white light of the Rona, almost immediately before she saw the green light, had known what were the real position and bearing of that vessel, it certainly would have been a wrong maneuver to put her helm hard a-port. If it be said, on the part of the Ava, that at the time the Rona was nearly enveloped in her own smoke, the answer is that if, from the first, the Ava had slacked her course until she knew what the real position of the Rona was, she need not have been in a position of having to make any maneuver in ignorance of the real state of things. * * * After considering the whole of the evidence attentively, their lordships have arrived at the conclusion that the Ava was in fault in not slackening her speed, and waiting to ascertain, before she ported her helm, what was the real position of the Rona."

See *The Continental*, 14 Wall. 345; *The Louisiana*, 21 How. 1, 5, 6.

3. If the Ping-On was in fault in porting her helm before ascertaining the position of the Condor, she was still more in fault in continuing to port after the Condor had announced that she was starboarding, and especially as she did not know what lights she presented to the Condor, and whether the latter might not be right in starboarding her helm.