JOHNSON et al. v. NAKAT PACKING CORPORATION.

THE HELEN J.

THE FREDERICK C.

No. 6031–A.

United States District Court, Alaska

First Div. Juneau.
July 23, 1949.

William L. Paul, Jr., Juneau, Alaska, for libellants.

R. E. Robertson, Juneau, Alaska, for libellee.

FOLTA, District Judge.

Libellants seek to recover damages sustained by the fishing vessel Helen J. as a result of a collision between her and the tow of the Frederick C. at about 3:15 a. m., September 7, 1948, in the narrowest part of the Ulloa Channel on the western side of Price of Wales Island, Alaska.

The Helen J. of 19 gross tons, owned by libellants, was proceeding in an easterly direction in Ulloa Channel at about 7 knots, while the Frederick C. of 73 gross tons,

with her tow on her port, was proceeding in the opposite direction at the speed of about 6½ knots. Both vessels were hugging the south short of the channel and collided within 20 yards of that shore. The night was dark and misty but calm, and the tide was slack. At the place where the collision occurred the channel is about 1,200 feet wide, libellants' exhibit No. 1.

As is so often the case, the testimony as to the collision itself is in conflict. Frank G. Johnson, co-owner of the Helen J. since 1935 and navigator at the time of the collision, testified that he has fished on the Helen J. since 1917; that, although the range lights of the Frederick C., as well as the Mears Island light to the south thereof, became visible to him from a distance of about two miles as the Helen J. rounded the point below Point San Antonio, he saw no other light on the tug or tow and no side lights until the vessels had approached within about a hundred yards of each other approximately three minutes before the collision when he saw the green light of the Frederick C. off his port bow; that the Frederick C. signaled for a starboard passing and immediately followed it with the danger signal; that he slowed down to 3 knots and turned to the right and then threw out the clutch about one and a half minutes before the collision; and that the Helen J. was pratically drifting when it was struck by the starboard corner of the tow of the Frederick C.

Since the vessels were approaching each other at a combined speed of approximately 1,300 feet a minute, the witness Johnson was obviously in error as to the intervening distance estimated at 100 yards, the time which elapsed before the collision, or both.

The Frederick C.'s tow, a fish scow which projected ahead of the Frederick C.'s bow, struck the port bow of the Helen J. and penetrated the hull above the water line to the depth of two or three feet, leaving a hole 4 x 9 feet, springing the hull out of line to such an extent as to require extensive redecking, replanking and other repairs costing $5,625.84.

Johnson further testified that the tow was not visible and that there was no light on it or on the mast of the Frederick C. to indicate it had a tow.

Gunderson testified that he had been master of the Frederick C. since 1943; that he was navigating the Frederick C. at the time of and preceding the collision, with a deck hand at the wheel; that, from the time he first saw the Helen J. until the collision 7 minutes later, the Helen J. was showing her red light to the Frederick C.: that he expected the Helen J. to change her course and at about 500 yards gave two blasts to "indicate I will keep my course", to which there was no response; that when they were about 100 yards apart he gave three blasts, put the Frederick C. into reverse and turned sharply to his left; that after reversing for about 30 seconds and, when the Frederick C. had lost all or nearly all headway, the Helen J. collided with his tow. The deckhand, however, testified that, from the time the Frederick C. blew the passing signal until the collision, he could see both of the Helen J.'s side lights.

The character of the hole in the port bow of the Helen J. cannot be reconciled with the respondent's version of the collision except upon the theory that the Helen J. had impaled itself upon the Frederick C.'s tow while going sidewise through the water at considerable speed. Manifestly, this version cannot be given credence. Indeed, it would seem that upon any view of the case the Frederick C. was at fault. Thus, from the admission of Gunderson that he observed the red light of the Helen J. for 7 minutes before the collision, it is clear that the Frederick C. was the burdened vessel and, under Article 19 of the Inland Rules, 33 U.S.C.A. § 204, bound to keep out of the way. If it be viewed as a meeting situation, it was the duty of the Frederick C. to pass the Helen J. on her port, under Article 18, Rule 1, 33 U.S.C.A. § 203; and if Ulloa Channel be held to be a narrow channel, within the meaning of Article 25, 33 U.S.C.A. § 210, then the Frederick C. was at fault for not keeping to her side of the fairway.

An examination of Libellants' Exhibit No. 1, Coast & Geodetic Survey chart No. 8151, of the northern part of Tlevak

Strait and Ulloa Channel, shows that Ulloa Channel is an inland passage connecting Bucarelli Bay on the north and Tlevak Strait on the south. Without it, the traffic along the western coast of Prince of Wales Island, which is not inconsiderable during the fishing season, would have to take to the ocean and follow the westerly shores of Sumez and Dall Islands. The only traffic in Ulloa Channel, therefore, is up and down in opposite directions, and this appears in the testimony. From these facts, I find that Ulloa Channel is a narrow channel within the meaning of the rule referred to. The Alfred W. Booth, D.C., 127 F. 453; Cf. The Lexington, 2 Cir., 275 F. 279, 284; The Bee, 2 Cir., 138 F. 303; U. S. v. Port of Portland, D. C., 161 F. 193, 207; The Benjamin Franklin, 2 Cir., 145 F. 13; Commonwealth & Dominion Line v. Seaboard Transportation Co., D.C., 258 F. 707, 709; The Admiral Watson, D.C., 266 F. 122; Luckenback S. S. Co. v. Societa, 9 Cir., 127 F.2d 86.

I conclude, therefore, that the Frederick C. was required to "keep to that side of the fairway or mid-channel of Ulloa Channel which lay to her starboard side", and that when she attempted, without an assenting signal and when there was risk of a collision, to pass on the left instead of the right, she assumed the risk of all the consequences. The Vanderbilt, 6 Wall. 225, 229-30, 18 L.Ed. 823; The St. John, 154 U.S. 586, 14 S.Ct. 1170, 20 L.Ed. 645; Occidental & O. S. S. Co. v. Smith, 9 Cir., 74 F. 261; Yamashita K. K. K. v. McCormick Intercoastal S. S. Co., 9 Cir., 20 F.2d 25; The Cascades, 9 Cir., 190 F. 729; The Dauntless, 2 Cir., 3 F.2d 529.

After the collision the Helen J. was towed by the Frederick C. to respondent's cannery at the upper end of Ulloa Channel where temporary patches were placed over the holes in her bow. She then proceeded under her own power to Kake where libellants reside, thence under escort to the shipyard at Wrangell where the vessel was repaired at a cost of $5,625.84, which I find to be reasonable.

The day of the collision was the last day of the summer season for commercial salmon fishing. Libellants' testimony that they could have caught $3,000 worth of salmon on that day is based on an observation made the previous evening of a school of salmon east of Ulloa Channel and perhaps also the fact that the run of salmon is usually at its peak at the close of the season. Libellants' Exhibit No. 3, showing the number of the various species of salmon caught and sold by the Helen J. between August 9th and September 6th shows that for the week preceding the collision the daily catch averaged $1,290.58 in value, and I find that it is reasonably certain that this amount would have been earned on the day of the collision, which, after deducting $28.57 for operating costs for the day, would leave $1,261.01 for distribution among the crew and the vessel. Of this amount the vessel owned by libellants was entitled to four shares, and the libellants, in common with the other four members of the crew, were entitled to one share each, or to a total of six of the ten shares. Three-fifths of $1,261.01 is $756.61, to which I find that the libellants are entitled. I also find that $50 a day is the reasonable value of a suitable substitute for the Helen J. and that, therefore, the libellants are entitled to the sum of $700 for the charter of the vessel George W. for two weeks during the fall fishing season and to the further sums of $180 for a convoy for the Helen J. from Kake to the shipyard at Wrangell, and $113 for 3 days' expenses incurred by libellant, Charles Johnson and a deckhand employed by him, in proceeding to Wrangell upon the completion of repairs and navigating the Helen J. back to Kake.