THE NEW YORK AND BALTIMORE TRANSPORTATION COMPANY, APPELLANTS, *v.* THE PHILADELPHIA AND SAVANNAH STEAM NAVIGATION COMPANY, OWNERS OF THE STEAMSHIP KEYSTONE STATE.

In a collision which took place in the river Delaware, between a steamship and a barge which was in tow of a propeller, the latter was in fault.

The lookout was not properly stationed, being in a place where his view was obstructed; and the propeller violated the rule which requires steamers approaching each other from opposite directions to port their helms, and pass each other on the larboa'd side.

A propeller with a barge in tow is not within the rule which applies to sailing vessels, and which requires steamships to keep out of their way. Propellers have nearly the same speed as side-wheel steamers, and quite as much power, and must be subject to the same rules of navigation.

THIS was an appeal from the Circuit Court of the United States for the eastern district of Pennsylvania.

It was a case of collision between the steamship Keystone State and a barge called the A. Groves, jun., which took place on the river Delaware, whereby the barge was sunk in the river, and her cargo greatly damaged.

The facts of the case are fully stated in the opinion of the court.

The libel was filed by the New York and Baltimore Transportation Company against the owners of the Keystone State The District Court dismissed the libel, and the Circuit Court, upon appeal, affirmed the decree. The libellants then appealed **to this court.**

It was argued by *Mr. Wharton* and *Mr. Schley* for the appellants; and by *Mr. McCall* and *Mr. Campbell* for the appellees

The points of fact averred by the respective counsel were stated briefly and clearly, and each position maintained by references to the evidence. They were as follows:

### Points of Fact averred by the Libellants.

1. The Artisan, with her tow, was on the Jersey side of the channel, near the buoy on the lower end of Marcus Hook bar, steering a course having Christine Light on her starboard bow.

2. The opposing vessels were nearly opposite the same point on the Pennsylvania side, (viz: Naaman's Creek,) when the steamship ported her helm.

3. By porting her helm, the steamship must have run across the channel.

The respondent's witnesses cannot say what course the steamship was steering when she ported her helm.

4. The channel was from a half to three-fourths of a mile wide, and the speed of the steamship was from nine to ten miles per hour.

That speed was maintained until she reached the propeller, and she came in line with her by porting the helm.

5. There was no necessity for the steamship to port her helm, and it was one cause of the disaster. When she did it, she was aware of the presence of the Artisan.

6. If the steamship had kept her course without porting, the vessels would have passed.

7. The propeller did all that she could to avoid the disaster, and escaped. The tow was comparatively helpless, and suffered. She was struck on the starboard side, about thirty feet from her stern, in a diagonal line inclining thereto, her whole length being about eighty feet. A touch of the wheel of the steamship to starboard would have cleared the barge.

### Points of Law relied on by Libellants.

1. The Artisan and her tow were not on an equality with the Keystone State, and the rules, whether statutory or judicial, applicable to vessels on an equality with respect to capacity of self-management, are not applicable to the former.

The act of Congress of August 30, 1852, (10 Stat. at Large, 61—72,) applies only to passenger steamers.

See section 42.

So, also, the rules of the inspectors, under the authority of the 29th section, in the matter of vessels passing each other, signal lights, &c., embrace only the same class of steamboats, and are intended to avoid collisions between such vessels.

Those rules were, however, obligatory on the Keystone State. The fifth rule of the Supervising Inspectors, adopted October 29, 1852, provides that it shall not be lawful for an ascending boat to cross a channel when a descending boat is so near that it would be possible for a collision to ensue therefrom.

This rule was violated by the steamer.

Although not bound by the statute, the propeller did adopt the dictates of prudence and good seamanship, by keeping in to the Jersey side of the channel, and leaving the centre of it free.

A tug with a tow in charge is at least as helpless, in comparison with a steamer, as a sailing vessel; and with respect to the latter, the rule is well settled, that the steamer meeting such a one must give way.

Fashion *v.* Wards, 6 McLean, 153.

New York and Liverpool Mail Steamship Co. *v.* Rumball, 21 Howard, 372.

The Oregon *v.* Rocca et al., 18 Howard, 570.

St. John *v.* Paine et al., 10 Howard, 583.

The Genesee Chief, 12 Howard, 451.

There is nothing in our case to make it an exceptional one, or subject it to other rules of navigation.

The Keystone State could have avoided the collision, by either of two very simple modes. She could have stopped her engines in time, or she could have put her helm to starboard, having the channel to her larboard free; and by the law of 1852, and the decisions of this court, she was bound to avoid the collision if possible.

2. It being night, and the steamer approaching the harbor,

464 SUPREME COURT.

New York and Balt. Trans. Co. v. Phil. and Savannah Steam Navigation Co.

it was her duty to proceed slowly and with caution. Not having done so, she is responsible for the consequences.

Culbertson v. Shaw, 18 Howard, 584.

Steamer Louisiana v. Fisher et al., 21 Howard, 1.

Peck v. Sanderson, 17 Howard, 178.

The James Watt, 2 W. Rob., 271.

The Birkenhead, 3 W. Rob., 75.

Steamboat New York v. Rea, 18 Howard, 228.

3. Even if the libellants committed any fault, (which is, however, denied,) a small exertion on the part of the respondents being sufficient to have prevented a collision, they were bound to make it.

The Genesee Chief, 12 Howard, 461; (ut supra.)

St. John v. Paine, 10 Howard, 557.

Newton v. Stebbins, 10 Howard, 586.

4. If both vessels were in fault, it was an error to throw the whole loss on the libellants; the damages should have been divided.

Brig James Gray v. John Frazer, 21 Howard, 184.

Schooner Catharine et al. v. Dickinson et al., 17 Howard, 170.

Chamberlain v. Ward, 21 Howard, 548.

The barge (the tow) followed the course of the Artisan, (the tug,) and obeyed her movements. She was entirely under her control. There is no evidence of any fault imputable to the barge; her being, therefore, the thing which actually came into collision with the steamer, makes no difference.

The James Gray, (ut supra,) 21 Howard, 194.

The question arises from the relative condition and action of the Artisan and the Keystone State.

### Points of Fact averred by Appellees.

1. Independently of all regulations, and of the rules of the maritime law, the usage of the river requires that approaching steamers shall port their helms and keep to the right in passing.

2. The vessels, steamer and propeller, with her tow, were, when first seen by each other, in or near the middle of the

ship channel, and the channel was of the width of three-quarters of a mile. The river, from shore to shore, was wholly unobstructed, and no reason of any character is suggested which should have caused a deviation, on the part of the propeller, from the law and usage which required the steamers to port their helms, and pass larboard to larboard.

3. The propeller, from the time the lights were first discovered, was duly reported by the lookout, and, for the distance of two or three miles, was kept constantly and attentively in view by the pilot of the steamship. The helm of the steamship was ported and the lights of the propeller kept a point or a point and a half on the larboard bow; when in close proximity, a wrongful change of direction on the part of those having charge of the propeller, by starboarding her helm, instead of porting it as they should have done, ran her across the bows of the steamer, and caused the collision of the barge with the steamship.

4. Those on board the propeller appear to have had no lookout; utterly disregarded the lights of the steamer, which clearly indicated her direction; made no change of course of any kind until the collision was imminent, and then the wrongful movement above referred to.

5. The pilot of the steamship, on perceiving this wrongful movement, which brought both vessels in peril, ordered the helm hard a-port, and the steamship to be slowed and stopped, which orders were instantly complied with, and the steamship was almost, if not entirely, at rest at the time of the collision.

The effect of these orders, which were prudent and necessary, was to enable the propeller to go clear; but she, being still under full headway, brought the barge in contact with the steamship.

6. No timely precaution of any kind was used by the propeller to avert the collision.

7. The steamship was proceeding up the river at a lower rate of speed than upon other parts of her voyage, and cautiously, with pilot and lookout.

8. The barge was attached to the propeller by a hawser, drag-

ging below her in a direct line, at the distance of 180 feet, in such matter that it was impossible for the pilot of the steamship to up the barge until the moment of collision.

9. If the barge had been attached to the propeller's side, or near her, or under her control, the collision would not have occurred, the propeller passing fully clear of the steamer, with a space of fifty feet intervening.

10. If the propeller had ported her helm, as required by law and the usage of the river, or had even slowed her speed, her tow would have cleared the steamship; and the fact that those on the propeller saw the red and white light of the steamer only, clearly exhibited the necessity for such movements; it necessarily follows, that when the bright and red light only are seen, the larboard side of the vessel is in view.

11. When those on board the propeller first saw the steamer, the propeller was above the buoy on the lower end of Marcus Hook. The channel below that point being on the western or Pennsylvania side of the river, gave to the steamship coming up the middle of the channel the appearance of being toward the Pennsylvania side. This may account for the erroneous statement of some of the libellant's witnesses, that the steamer was on the Pennsylvania side, and not in the mid-channel.

Map Coast Survey.

12. The captain of the propeller states that she had the Christine light a little on her starboard bow, but before the collision, and before his wrongful order to starboard, the captain also says: We were near the middle of the river, steaming down. The latter statement must be taken as correct, especially in view of the respondent's evidence. In any event, it would not be inconsistent with the fact that the steamer was in the middle of the channel.

### Points of Law relied on by Appellees.

1. The act of Congress of 1852, 10 Statutes at Large, 61—72, and the rules of the supervising inspectors appointed under the same, were applicable to the Keystone State, as a passenger steamer, and to the propeller also, if carrying passengers, as

set forth in the libel, so far as respects lights and move-
ments.

2. The admiralty rules are imperative—they are obligatory
upon vessels approaching each other from the time the neces-
sity for precaution begins, and continue so long as they ad-
vance.

N. Y. and L. U. S. S. Co. *v.* Rumball, 21 Howard, 383.

3. The rule laid down is, that when two steam vessels are
approaching each other, each shall port, and go to the right,
passing each other larboard and larboard.

This rule is imperative in English courts of admiralty, and
fully adopted by the United States courts.

The Duke of Sussex, 1 Wm. Rob., 285.

The Gazelle, 1 Wm. Rob., 471.

The James Watt, 2 Wm. Rob., 271.

St. John et al. *v* Paine, 10 Howard, 558.

Origin et al. *v* the Rocca, 18 Howard, 572.

Wheeler *v.* the Steamer Eastern State, 2 Curtis, 142.

4. A propeller, whether carrying passengers or engaged and
used only for towing, and when having a tow in charge, is still
a steamer, subject to all the general rules applicable to steam-
ers; and the rule of law makes no such distinction as would
require them to be considered with respect to other steamers
as sailing vessels; on the contrary, a steamer with a tow in
charge is bound to adopt the same rules with regard to a sail-
ing vessel as a passenger steamer; no distinction is recognised
between them.

Steamer New York *v.* Rea, 18 Howard, 223.

They are required also to have a lookout, charged specially
with the duty.

Chamberlain *v.* Ward, 21 Howard, 571.

5. It was the duty of the propeller to have a competent and
vigilant lookout stationed at the forward part of the steamer,
in the position best adapted to descry vessels at the earliest
moment, actually and vigilantly employed in the performance
of that duty.

St. John *v.* Paine, 10 How., 557.

Chamberlain *v.* Ward, 21 How., 548.

The James Gray *v.* the John Frazer, 21 How., 192.

6. No such condition of things existed at the time and place of the collision as required the speed of the steamer to be reduced more than that stated in the evidence. The distance from the port of Philadelphia was twenty miles, and there were no vessels at anchor, or otherwise to interfere with the full use of the whole channel.

    Steamer New York *v.* Rea, 18 Howard, 223.

    Culberston *v.* Shaw, 18 Howard, 584.

    The James Gray *v.* the John Frazer, 21 Howard, 185.

7. The 5th rule of the supervising inspectors, adopted October 29th, 1852, is cited in appellant's brief as providing, "that it shall not be lawful for an ascending boat to cross a channel when a descending boat is so near that it would be possible for a collision to ensue therefrom." This rule (the appellants aver) was violated by the steamer. The rule cited refers exclusively to boats navigating the "rivers falling into the Gulf of Mexico and its tributaries."

   Mr. Justice CLIFFORD delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the eastern district of Pennsylvania, in a cause of collision, civil and maritime.

It was a suit *in rem* against the steamship the Keystone State, brought by the appellants as the owners of the barge known as the A. Groves, jun., to recover damages on account of a collision which took place on the eighteenth day of August, 1857, between the steamer and the barge on the river Delaware, whereby the barge was sunk in the river, and her cargo was greatly damaged.

At the time of the disaster the barge was in tow of a propeller, called the Artisan, which was also owned by the appellants, and to which the barge was attached by a hawser, about one hundred and seventy feet in length. It occurred between one and two o'clock in the morning, about twenty miles below the city of Philadelphia, to which port the steamer was bound on her return trip from Savannah, in the State of Georgia.

According to the case made in the libel, the propeller, with

the barge in tow, was on her way from the city of New York to the city of Baltimore, with her usual complement of freight. She was proceeding down the river, on the eastern side of the channel, and the steamer was coming up the river, on the opposite side of the channel, with ample room to have kept clear of the barge.

To show that neither the propeller nor the barge was in fault, it is alleged by the libellants that both those vessels had proper lights, and that the propeller had sufficient lookouts properly stationed on the vessel, and that they were vigilantly employed in the performance of their duties. They also allege that the steamer, when about three-quarters of a mile distant from the propeller, changed her course more out into the stream of the river, heading diagonally across the channel, in the direction of the descending vessels, and ran with great force and violence against the barge, striking her on the starboard side, near the after gangway, and cutting her down to such an extent that she immediately sunk in the river. In this connection they also allege that the barge, at the time of the collision, was laden with a cargo of merchandise, valued at seventy thousand dollars, and that the goods were damaged by the disaster to an amount equal to half their estimated value.

It is denied by the respondents that the circumstances attending the collision are truly stated in the libel. On the contrary, they aver that it was occasioned wholly through the fault and gross negligence of those in charge of the descending vessels. To lay the foundation for that theory, they allege that while the steamer was proceeding up the river at mid-channel, in the regular course of her voyage, and when about four miles below Marcus Hook, the second mate, pilot, and lookout of the steamer, discovered lights directly ahead, which appeared to be about three miles distant; that the steamer continued her course up the channel, keeping the lights on her larboard bow, but as near ahead as was practicable; that after continuing that course for some time, and when about a mile distant from the lights, they were found to be the lights of the propeller, and appeared to be at mid-channel.

Orders were then given by the pilot of the steamer to port her helm, so as to bring the lights of the propeller a point on the larboard bow of the steamer; and the order was forthwith obeyed. At that time the steamer, as alleged in the answer, was heading northeast by east; and she continued on that course, keeping the lights of the propeller one point on her larboard bow, until she approached within three hundred yards of the lights, when the propeller suddenly starboarded her helm, and attempted to cross the bows of the steamer. On seeing the propeller change her course in that direction, the pilot of the steamer gave the signal to slow and stop in immediate succession, and the orders, as alleged, were promptly obeyed. Those orders were so far carried into effect that the propeller passed on her course without injury; but the barge was dragged by the hawser directly against the bows of the steamer, and thereby received the damage, as alleged in the libel.

Such is the substance of the pleadings, respecting the circumstances attending the collision, so far as it is necessary to examine them at the present time.

After the hearing in the District Court, a decree was entered for the respondents, dismissing the libel; and on appeal to the Circuit Court, that decree was affirmed—whereupon the libellants appealed to this court.

As appears by the proofs, the steamer, at the time of the collision, was well manned and equipped, and was in charge of a branch pilot, fully qualified to conduct and manage steam vessels on that river. She was a side-wheel steamer, of fifteen hundred tons burden, engaged in carrying freight and passengers, and had proper lights and sufficient and vigilant lookouts. They discovered the lights of the propeller when she was three miles distant, and continued to watch the lights till the collision occurred. On the other hand, the propeller was a vessel of one hundred and twenty-two tons burden, and the tonnage of the barge was about the same.

Three men, the master, the wheelsman, and one of the watchmen, were on the deck of the propeller at the time of the collision. All of the other hands, including the pilot, were below. Of those on deck, the master was standing for-

ward of the pilot-house, but the watchman was standing aft the house, which he admits was higher than his head, so that he could not see over it. His position for a lookout was clearly an improper one, as the view forward was entirely obstructed by the house of the vessel. Chamberlain and al. *v.* Ward and al., 21 How., 570. Lookouts stationed in positions where the view forward, or on the side of the vessel to which they are assigned, is obstructed by the lights or any part of the vessel, do not constitute a compliance with the requirement of the law.

To constitute such a compliance, they must be persons of suitable experience, properly stationed on the vessel, and actively and vigilantly employed in the performance of that duty.

In this case, however, it appears that the steamer was actually seen by the master, who was in charge of the deck, in season to have adopted every necessary precaution to have avoided the disaster, but he admits that he did not pay much attention to the approaching vessel. When he first saw her, he says she was proceeding right up the river, but adds, that in the course of five minutes she changed her course, and ran from the western towards the eastern shore, which is the theory set up in the libel. According to the evidence, the speed of the steamer was nine or ten miles an hour, and that of the propeller was seven or eight miles an hour, with an ebb tide. At the place where the collision occurred, the channel of the river is about three-fourths of a mile wide, and the evidence shows that there is a cove or bend in the river below, so that a vessel coming up the river in the night-time would appear to an inattentive or casual observer, standing on the deck of a descending vessel, as being near the western shore, when in point of fact she was at mid-channel. Witnesses on both sides were examined as to the character of the night, and they generally agree, that while it was somewhat cloudy, there were intervening stars, and that it was not unusually dark.

Two propositions were chiefly relied on by the libellants. In the first place it was insisted in their behalf, that the propeller, with the barge in tow, ought to be regarded in the

same light as a sailing vessel, and that it was the duty of the steamer to keep out of the way. No authority was cited in support of the proposition, and we are not aware of any decided case that favors that view of the law. Steamers are required to keep out of the way of sailing vessels, upon the ground that their power and speed are far greater than vessels of the latter class, and because those in charge of them can more readily and effectually command and appropriate that power and speed so as to avoid a collision, when it would be impossible for the sailing vessel to keep out of the way. St. John *v.* Paine, 10 How., 583. The Genesee Chief, 12 How., 463. Steamship Co. *v.* Rumball, 21 How., 384. None of the reasons on which the rule is founded, as applied to sailing vessels, exist in a case like the present. Propellers have nearly the same speed as side-wheel steamers, and quite as much power. Whether they obey the helm as readily or not, may admit of a question, but there is not sufficient difference in that behalf to justify any discrimination whatever in the application of the rules of navigation. If they take other craft in tow, those in charge of them ought to augment their vigilance in proportion to the embarrassments they have to encounter, especially when they do not see fit to slacken their speed.

It is insisted, in the second place, that the collision was occasioned through the fault of the steamer; that she changed her course and attempted to pass the bows of the propeller, as is alleged in the libel.

On the part of the respondents, this proposition of facts is denied, and they insist that the fault was committed by the propeller, in omitting to port her helm and go to the right. Beyond question, the law is well settled that steamers approaching each other from opposite directions are respectively bound to port their helms and pass each other on the larboard side.

No attempt was made at the argument to controvert the proposition, and it is too firmly established by decided cases to require any argument in its support. The Duke of Sussex, 1 Wm. Rob., 285. The Gazelle, 1 Wm. Rob., 471. The James Watt, 2 Wm. Rob., 271. St. John *v.* Paine, 10 How., 558. The Oregon *v.* Rocca, 18 How., 572. Wheeler *v.* the

Eastern State, 2 Cur. C. C., 142. Much testimony was introduced on the one side and the other upon this point, and it is somewhat conflicting. All that can be done under the circumstances with any possible advantage to either party will be to state our conclusions upon the evidence. After a careful examination of the depositions, we think it is clearly proved that both vessels as they approached each other were near mid-channel. Most of the witnesses on board the steamer expressly affirm that she was near mid-channel when the lights of the propeller were first discovered, and they all agree that her helm was not changed, except for the purpose of bringing the lights of the propeller one point on her larboard bow, until the propeller starboarded her helm, and attempted to cross the bows of the steamer. That movement of the propeller was a direct violation of the rules of navigation, and was entirely without any excuse. Her master may have been deceived as to the course of the steamer, by the slight bend in the river; but if so, it is the misfortune of those who employed him that he was not better acquainted with the navigation, or more attentive to his duty.

The decree of the Circuit Court is therefore affirmed with costs.