### THE CAPTAIN BENNETT.

### THE FLORENCE.

(District Court, E. D. Pennsylvania. June 23, 1909.)

Nos. 20, 21.

1. COLLISION (§ 90*)—VESSELS ON CROSSING COURSES—STARBOARD-HAND RULE.

The starboard-hand rule for vessels on crossing courses, requiring the one which has the other on her starboard hand to keep out of the way and the other to keep her course and speed, has its usual application upon the open sea or upon a comparatively broad expanse of water, where each vessel is free to maneuver, and ordinarily cannot be applied to vessels in a narrow and winding channel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 182, 183; Dec. Dig. § 90.*]

2. COLLISION (§ 20*)—RULES—DUTY OF PRIVILEGED VESSEL.

A privileged vessel entitled under the rules to keep her course and speed as between her and another vessel approaching loses such privilege as soon as it appears that the other vessel is failing in her duty to take such course as to keep out of the way, and is then required by Pilot Rules (Ed. 1905) p. 4, rule 3, to sound alarm signals, and, if the vessels are within half a mile of each other, to slow down, until an understanding is reached.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 17; Dec. Dig. § 20.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. Collision (§ 102\*)—Steam Vessels on Converging Courses—Mutual
   Faults.
   . The steam barge Florence, passing down the Delaware from Philadel-
   phia at night, came into collision with the steamship Bennett, coming up.
   The vessels saw each other when a mile and a half apart, and were on
   converging courses; the Florence having the Bennett on her starboard
   hand. The evidence as to the signals was conflicting; the Florence claim-
   ing to have blown two whistles, and starboarded, although she received
   no answer, and to have then again given the same signal, which was
   crossed, while the Bennett claimed to have given the first signal of one
   whistle, which was assented to, when she ported. *Held*, that both ves-
   sels were in fault accepting their own testimony; the Florence for at-
   tempting to cross ahead of the Bennett without an agreement, and the
   Bennett for being on the left-hand side of the channel, and both for con-
   tinuing their speed after it. was apparent that they were not maneuver-
   ing in harmony.

   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.\*]

In Admiralty. Cross-suits for collision.

Henry R. Edmunds, for the Captain Bennett.
Francis C. Adler and John F. Lewis, for the Florence.

J. B. McPHERSON, District Judge. These are cross-libels for col-
lision, in which the usual conflict of testimony is presented. I find
the facts to be as follows: The steam barge Florence is a large
vessel of her class, about 100 feet long and 22 feet beam, and runs
regularly between Philadelphia and Bridgeton. On the afternoon
of April 10, 1906, she left Philadelphia on one of her trips, carry-
ing freight and drawing about 8 feet of water, and was proceed-
ing south on the Delaware river. The tide was ebb, and there was
no wind that need be noticed. The collision took place after dark
between 7:30 and 8 o'clock; but the night was clear, and there was
nothing to prevent each vessel from seeing the lights of the other
for at least two miles. Both vessels displayed the proper lights,
both had lookouts, and each was aware of the other's presence more
than a mile and a half away. The Florence, whose master was at
the wheel, was following the New Castle range; the lights being
at her back, and her course being about S. S. E. But she· was keep-
ing the lights somewhat open to the westward, thus being in a prop-
er position on the starboard side of the channel. She had passed
Ft. Delaware on the southern end of Pea Patch Island, when her
attention was first directed to the Bennett, which was then coming
up the river on the Finn's Point range, in charge of a licensed pilot.
The Bennett is a Norwegian steamship, and was bound to Phila-
delphia with a cargo of bananas from Port Antonio. The Finn's
Point range bears to the N. N.· E., and intersects the New Castle
range obtusely at a point about a mile south of Ft. Delaware. (It
is supposed by counsel for the Bennett that the two ranges inter-
sect at buoy No. 20; but this is a mistake. It is the Reedy Island
range that intersects the New Castle range at the buoy; the Finn's
Point range intersecting about a quarter of a mile farther to the N. N.
W.) The Bennett observed the Florence at about the same time,

and the vessels were then not less than a mile and a half apart, as shown by the chart. (The barge had recently passed Ft. Delaware, and the steamship was not far away from Reedy Island, where she had stopped for inspection by the quarantine officials.) The Florence was on a course bearing S. S. E., and the Bennett on a course bearing about N. N. E. At least this would have been the Bennett's course if she had been running the Finn's Point range closely; but, as she was concededly running the range open to the westward, it is probably more accurate to say that she was headed N. by E. It will be observed that these were converging courses, and this fact was clearly evident to both vessels. The Bennett admits that she saw the masthead light and the green light of the Florence, and I have no doubt that the Florence saw the masthead light and the red light of the Bennett. It is true that the master of the Florence testified that he saw the masthead light and both lights of the Bennett when he first observed the steamship; but his testimony is not corroborated, and I cannot accept it as credible. The lookout upon his vessel was not produced—apparently no serious effort was made to find him—and, as no one else was on the deck of the Florence until just before or just after the collision, there is no other witness to strengthen the master's story. On the other hand, while I think it likely that the Bennett was cutting the angle of the ranges somewhat in the effort to save time on her voyage to Philadelphia, I see no sufficient reason to doubt the testimony that puts her not far off the Finn's Point range, although she was certainly to the westward in the channel, and was therefore not in her proper position. This was a narrow channel, and no reason is shown for her failure to obey article 25 of the Pilot Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which expressly provides that:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of the vessel."

The Florence was moving with the tide at a speed of about 7 miles an hour, while the Bennett was coming at full speed at a rate over the ground of 12 or 13 knots, so that the vessels were rapidly converging toward a point where danger might be anticipated, and where both vessels were manifestly required to exercise caution and to proceed strictly in accordance with the rules of navigation. Concerning what now took place there is positive conflict in the testimony; each vessel claiming to have given the first signal, and each accusing the other of fault in failing to accept, or in crossing, the whistle. Whatever the fact may be, I think the Florence at least is chargeable with fault at this juncture. Accepting her own account of the signals as correct, she blew two blasts as soon as she discovered the Bennett and starboarded her wheel at once without waiting for a reply. Receiving no answer, she blew two blasts a second time, and again put her wheel to starboard. To this second signal the Bennett blew one blast, ported her wheel, and thus made the collision inevitable, if it had not been inevitable before. One of the Bennett's arguments is that the "starboard-hand" rule applied,

and that the Florence was therefore bound to keep out of the way. At the date of this collision rules 2 and 3 (Pilot Rules [Official Edition 1905], page 4) were in force, and these rules provide as follows:

"Rule 2. When steamers are approaching each other in an oblique direction, as shown in the diagrams of the fourth and fifth situations, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other, which latter vessel shall keep her course and speed; the steam vessel having the other on her starboard side indicating by one blast of her whistle her intention to direct her course to starboard, so as to cross the stern of the other steamer; and two blasts, her intention of directing her course to port, which signals must be promptly answered by the steamer having the right of way, but the giving and answering signals by a vessel required to keep her course shall not vary the duties and obligations of the respective vessels.

"Rule 3. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short rapid blasts, not less than four, of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other.

"Vessels approaching each other from opposite directions are forbidden to use what has become technically known among pilots as 'cross-signals'—that is, answering one whistle with two, and answering two whistles with one. In all cases, and under all circumstances a pilot receiving either of the whistle signals provided in the rules which for any reason he deems injudicious to comply with, instead of answering it with a cross-signal, must at once observe the provisions of this rule."

If rule 2 is to be applied, the Bennett was the privileged vessel, for the fourth situation was presented (as shown in the diagram on page 9 of the rules), and it is therefore clear that the Florence had the Bennett on her starboard side and was in the first instance bound to keep out of the way. She might pass to starboard under the Bennett's stern, or, at her option and risk, she might pass to port, if the conditions seemed to call for such a maneuver; but the Bennett had the right of way, and, in the first instance, was bound to keep her course and speed. Assuming that the Florence knew the rules of the road and was aware of her obligation to follow them, and assuming also that she whistled first, signaling with two blasts, and thus indicating that she intended to pass the Bennett on her starboard hand, she selected the more hazardous course of crossing the Bennett's bow. The reason given for this choice is that she was close to the Pea Patch Shoal, and that she was afraid to go to starboard, because of the risk that she might run aground. Whatever her reason may have been, rule 2 allowed her to choose between passing to starboard or passing to port; but certainly, if she chose the more dangerous course, she was the more bound to exercise care in following the other requirements of the rules in order that the maneuver might be executed in safety. I shall take it for granted, also, that the Bennett heard the two whistle signal, and that she made no reply. The Florence, however, without waiting for an answer, starboarded her helm, changing her course to port, and thus increasing the danger of collision, unless the Bennett should accept

the signal and change her own course to port. Instead of accepting the signal, however, the Bennett kept her course and speed, while the Florence continued to move to port, although the silence of the Bennett must have at least given ground to suspect that the proposed maneuver was either not understood or was not accepted. This is clear from the fact that the Florence was obliged to signal a second time that she was going to port, and here, I think,· was an unmistakable fault. Instead of persisting in her effort to cross the bows of the Bennett—which was the privileged vessel, having the right of way—the Florence should have obeyed rule 3, and, as she certainly did not understand the course or intention of the Bennett, she should have blown danger signals; and, as the vessels were then within half a mile of each other, she should also have been immediately slowed until the proper signals had been given, answered, and understood, or until the vessels had passed each other. I am aware that there is testimony on behalf of the Florence that she did blow danger signals before the collision, and that she stopped and reversed, so that her way was entirely stopped; but I do not believe that such signals were given until after the collision, or, at the best, until just before it happened, when it could not be avoided. To my mind, the convincing proof that the Florence had. not slowed down is to be found in the testimony concerning the effect of the blow, and in the photographs that show her condition shortly afterward. It is undeniable that she struck the Bennett a glancing blow aft of amidships on the Bennett's port side, and even a casual glance at the photographs will show its severity, and that the Florence delivered the blow. If her story were true, she would have received the blow while lying "dead in the water" (as her master described the situation), and it is hardly necessary to point out that in such event she would have been scraped rather than struck, and that in no case could she possibly have been struck on the port side of her stem so severely as to break her bow nearly down to the water line, tear off her planking, shift her boiler, disconnect her piping, and injure her so badly that she would have sunk if she had not been taken hold of by a passing tug (the George F. Brady) and put on the flats near by.

But I think it may well be doubted whether the starboard-hand rule applied to the situation disclosed by this testimony. The Supreme Court seems to be of this opinion, as appears by the following quotation from The Victory, 168 U. S. at page 418, 18 Sup. Ct. at page 153, 42 L. Ed. 519:

"Indeed, the rule applicable when two vessels 'are crossing so as to involve risk of collision,' that 'the vessel which has the other on her own starboard side shall keep out of the way,' is ordinarily inapplicable to vessels coming around bends in channels, which may at times bring one vessel on the starboard of the other. It has often been held as a general rule of navigation that vessels approaching each other in narrow channels, or where their courses diverge as much as 1½ or 2 points, are bound to keep to port and pass to the right, whatever the occasional effect of the sinuosities of the channel. New York & Baltimore Transportation Co. v. Philadelphia & Savannah Steam Navigation Co., 22 How. 461, 16 L. Ed. 397: Union Steamship Co. v. New York Steamship Co., 24 How. 307, 16 L. Ed. 699; The Vanderbilt, 6 Wall. 225, 18 L.

Ed. 823; The Johnson, 9 Wall. 146, 19 L. Ed. 610; The John L. Hasbrouck, 93 U. S. 405, 23 L. Ed. 962; The Berkshire, 33 U. S. App. 531, 540, 74 Fed. 906, 21 C. C. A. 169."

The starboard-hand rule has its usual application upon the open sea, or upon a comparatively broad expanse of water, where each vessel is free to maneuver without regard to the dangers inseparable from a narrow channel; but where vessels are approaching each other on a river such as the Delaware, where the channel winds about and is usually not broad, the vessels are necessarily put into positions that would mean one thing at sea, while they may have a different meaning upon the river. Ordinarily therefore the rule cannot be applied. When vessels are running intersecting ranges, as in the present case, each is bound to know where the ranges lead and to know the effect that their respective directions may have upon the other's lights. Each may properly assume, and is bound I think to assume, until the contrary appears, that the other will obey the rules of navigation and will be guided by the ranges as the only safe course. If the Florence had acted in accordance with this principle, she would have known that, while her course and the course of the Bennett were converging, they were not necessarily crossing courses, and that if each followed the ranges and obeyed the rules of the road they were likely to pass in safety. She would not have been forced aground on the Pea Patch Shoal, because the Bennett would have been on the eastern side of the channel; and, even if there had been any danger from the shoal, she could have been absolutely safe by blowing danger signals and by slowing or stopping and reversing. But she preferred to run the risk of crossing the Bennett's bows, instead of proceeding with caution on the starboard side of the channel until the turn of the ranges should be reached, when it is quite certain, I think, that the vessels would have been found at a safe distance apart. In my opinion the collision is primarily due to the fault of the Florence in crossing toward the eastern side of the channel unnecessarily and without sufficient justification, and also to her fault in failing to blow danger signals and to slow or stop and reverse when her maneuver had brought her into a dangerous situation.

This being so, the burden of proof is upon her to prove that the Bennett was also guilty of contributory fault. The Victory, supra. Upon this point I think there is little room to doubt. In the first place, she was on the wrong side of the fairway when she discovered the Florence, and I am not satisfied that this position did not in some degree contribute to the disaster. It is true that the pilot testified that he got back promptly upon the Finn's Point range; but, even if he did, I think he should have taken his vessel somewhat to the eastward of the range so as to comply strictly with rule 25. Unquestionably, if he had been to the eastward, the collision would not have happened, for (even as it was) the Florence nearly missed the steamship, and would have missed her altogether if there had been a few feet more space; but, without insisting on this consideration, there is a much more important particular in which the Bennett was equally at fault upon her own testimony. Of course, if the account given by the Florence is correct, the Bennett was undoubtedly to blame, for upon that

supposition she not only failed to hear and answer the first signal of the barge, but she crossed the second signal, meanwhile continuing her course and speed, instead of respecting the requirement of the first paragraph of rule 3; but, taking her own account of the occurrence for granted, she was no less clearly to blame. Her testimony is that she signaled first, blowing one blast, and thus indicating her intention to pass to starboard. To this the Florence replied with one blast, thus accepting the proposition in form, although she kept her course without change. This doubtful situation continued for several minutes, so that, as the testimony shows, the Bennett was perplexed and did not understand what the Florence was intending to do. In this condition of affairs, the first paragraph of rule 3 is explicit. If the starboard-hand rule should be applied, while rule 2 made the Bennett the privileged vessel, it did not give her the right to hold her course and speed indefinitely and under all circumstances. She was entitled to hold on in the first instance (The Delaware, 161 U. S. 469, 16 Sup. Ct. 516, 40 L. Ed. 771) ; but, as soon as there was some distinct indication that the Florence was about to fail in her duty, the Bennett lost her privilege and was then bound to obey rule 3 and to take the wise precautions enjoined by its first paragraph. This she wholly failed to do, for, instead of giving danger signals and slowing down, as required by the rule, she signaled again with one blast and went on at full speed. Without doubt, as it seems to me, this conduct contributed actively to the collision, and I have no hesitation in finding that she was also to blame; and, if the starboard-hand rule does not apply, she was as clearly to blame for continuing at full speed, in spite of her knowledge that the Florence (however wrongfully) was persisting in a course that threatened disaster. If the steamship had stopped and reversed, or even if she had slowed down, the vessels would have passed in safety. As it seems to me, this collision is another illustration of the danger that accompanies the constantly observed reluctance of vessels to slow up even for a short time, in spite of the fact that going on at speed means certain peril.

It is unnecessary to consider the allegation that the Bennett was in fault for not standing by after the collision. The Florence was in danger of sinking and was signaling for help. Unquestionably it was the duty of the Bennett to aid her if she herself was in condition so to do, and if it be true that she got off the ground in a few minutes and proceeded up the river without making any effort to find and help the Florence, as the testimony of the Brady seems to indicate, she was presumptively at fault. If, however, as she asserts, she was herself aground and remained in that predicament for more than a half hour, her failure to offer help would no doubt be sufficiently explained. The question is not important, however, if (as I have found) she was at fault in other respects, and therefore I need not consider the testimony upon this point.

There is some dispute also between the vessels concerning the place of collision; the Bennett insisting that it happened below the intersection of the ranges, and the Florence being equally positive that it took place above the intersection. In the view I have taken of the obligation and conduct of the parties, it is not material to decide with ac-

curacy where the vessels came together, although I think the decided weight of the evidence tends to the conclusion that the point of contact was close to the intersection and certainly was before either vessel had turned to follow the new range. This is indicated by the testimony concerning the color of the side light that was visible upon either vessel respectively, by the angle at which the Florence delivered the blow, and by the fact that both were grounded on the New Jersey shore not far below the intersection. As the Florence was disabled by the collision and drifted helplessly with the ebb tide for some minutes before the Brady came to her assistance, it is evident that she must have been below the point of contact when she was picked up, for she was no doubt put on the flats as speedily as possible. The Bennett had put her helm hard aport just before the collision, and this maneuver, combined with the blow, drove her aground not far from the point to which the Florence was afterwards towed.

A decree may be entered finding both vessels at fault, and referring the subject of damages to a commissioner.