## THE FLORENCE.

### THE CAPTAIN BENNETT.

(Circuit Court of Appeals, Third Circuit. March 7, 1911.)

### No. 1,404.

COLLISION (§ 91*)—STEAM VESSELS MEETING IN NARROW CHANNEL—VIOLATION OF RULE.

The steam barge Florence, passing down the Delaware from Philadelphia at night, came into collision with the steamship Bennett, coming up. The vessels saw each other's lights when a mile and a half or more apart. The Florence was following the New Castle range, but was somewhat to the right or westward of it, while the Bennett was on the Finn's Point range. The two ranges converge so as to require a change of course of some three points to pass from one to the other at intersection, and the collision occurred near the intersection. The Florence admittedly gave a signal of two blasts, indicating her intention to cross ahead of the Bennett, and starboarded her helm, but her signal was not heard nor answered by the Bennett until immediately before collision, and she then gave a signal of one blast and kept her course and speed. *Held*, that the narrow channel rule (Act June 7, 1897, c. 4, art. 25, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]) applied and required the Florence to keep to the right side of the channel and pass port to port and that she was in fault for attempting to cross; that the Bennett was not in fault, having the right to assume that the Florence would remain on her side of the channel.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 91.*]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Cross-suits in admiralty for collision between the steam barge Florence and the steamship Captain Bennett. Decree against both vessels, and both appeal. Reversed on the Bennett's appeal, and decree directed against the Florence alone.

For opinion below, see 171 Fed. 199.

Henry R. Edmunds and Wallace, Butler & Brown (Frederick M. Brown, of counsel), for The Captain Bennett.

John F. Lewis and F. C. Adler, for The Barge Florence.

Before BUFFINGTON and LANNING, Circuit Judges, and CROSS, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

LANNING, Circuit Judge. The steam barge Florence and the steamship Captain Bennett collided in the Delaware river below Philadelphia on the evening of April 10, 1906. A libel for damages was filed by the owners of each of the vessels against the other vessel. The district court, by its final decree, adjudged both vessels at fault, and directed the joint damages and costs, amounting to $12,653.22, to be equally divided between them. Both vessels have appealed.

The night was clear. The Florence was going down the river, in a south-south-easterly direction, in the portion of the river's channel marked by the Newcastle range lights, which were back of her. The Bennett was going up the river, in a north-north-easterly direction, in the portion of the river's channel marked by the Finn's Point range lights, which were ahead of her. On reaching the intersection of the two lines of range lights, a vessel on one of the ranges would need to alter her course but about three points of the compass to get on the other range. At the moment of the collision, the navigation of the Florence was, and at least for two hours previously had been, in charge of the master, Blocksom, who was also at the wheel in the pilot house. Russell was acting as the lookout. No other member of the crew was upon the deck or in a position to see the Bennett before the Florence blew her danger signals. Russell was not called as a witness, and, although Blocksom says he endeavored to find him, his evidence shows that he made no proper effort to secure Russell's testimony. Blocksom is the only witness testifying for the Florence who claims to have seen the Bennett before the Florence blew her danger signals, and he was acting as navigator, pilot, and helmsman. The Bennett was manned in part by Chambers, who was a pilot taken on at the Delaware Breakwater, Wick the helmsman, Nelson the lookout, and Garmann the second mate, all of whom were on duty at the time of and before the collision, and all of whom testify to conditions preceding the collision.

The two vessels were approaching each other on converging lines. The Bennett was drawing about 17 feet of water and the Florence about 7½ feet. The navigable channel was not wide, but it was considerably wider for the Florence than for the Bennett. Blocksom says that, when he first saw the Bennett, the Florence was as far on her starboard side of the channel marked by the Newcastle range lights as it was prudent for her to go, and that, though the Bennett had not yet reached the Newcastle range, he saw both of the Bennett's side lights. If that statement be true, and if the Florence was far above the intersection of the two lines of range lights as her witnesses claim, the Bennett, while in the Finn's Point range, was headed to cut across the shoals before reaching the intersection, and was taking a course which Blocksom deemed unsafe even for the Florence. The pilot of the Bennett held a first-class pilot license, and had piloted many vessels larger than the Bennett up and down the Delaware river. He knew the channels and the range lights. Not only is Blocksom's statement that the Bennett showed both of her side lights to the Florence contradicted by the witnesses for the Bennett, but, as the learned district judge in his opinion (171 Fed. 199) said, it is intrinsically incredible. The collision cannot be accounted for on that theory.

Counsel for the Florence has by an elaborate argument endeavored to show that the collision occurred on the westerly side of the channel marked by the Newcastle range lights and above the intersection of the two lines of range lights. Fixing the point of the collision there, he argues that the Bennett disregarded the rules of the road and was solely at fault. But the collision could not have occurred there unless the Bennett before reaching the intersection cut across the shoals from the Finn's Point range to the Newcastle range, or unless she had at the intersection, or, after turning it, passed into the westerly side of the Newcastle range, and proceeded up the river on that side. The first of these theories we have rejected. As to the second of them, the evidence is contradictory. Blocksom says that the collision occurred "just above the buoy on the lower end of the Pea Patch Shoals." According to the government chart that is about a mile above the intersection. Desmaris, the pilot of the Florence, who, however, was in bed up to the time when he heard the distress signals, says it occurred about half a mile below Ft. Delaware and above the light at Salem creek. That was a mile or more above the intersection. Cook, one of the crew of the Florence, who was also in bed until awakened by the danger signals, says the collision occurred "just below the Pea Patch Shoal buoy." The buoy by the chart appears to be nearly a mile above the intersection. Lewis, the pilot of the tug Brady, who was going down on the Newcastle range, and who a few minutes after the collision picked up the Florence and towed her to the flats a mile or more below the intersection, says that, when he reached the Florence, she was "about quarter of a mile below Pea Patch buoy" and "above the intersection of Finn's Point range with the Newcastle range." Hazel, the master of the Brady, says that the Brady was running the Newcastle range when she picked up the Florence "just a little above" the intersection of the two ranges. Blocksom and Cook also say the Florence was on the westerly side of the line of the Newcastle lights, and Lewis says that the Brady "was running on Newcastle range a little to the westward" when she picked up the Florence.

Chambers, the Bennett's pilot, says that, with the aid of his glasses, he first observed the green or starboard side light of the Florence about two points off his port bow, when he was on the Finn's Point range, and when the Florence was about three miles away; that at that time he was slightly on the westerly side of the line of the Finn's Point lights; that he then ported his wheel and brought the Bennett up on the range and steadied her there; that the Florence continued to show to the Bennett her green light and made no change at any time before the collision; that he continued to keep his course and speed; that he is "quite sure" the collision occurred below the intersection; that his view of the Newcastle range lights was obstructed by Ft. Delaware until he came very near to the intersection, and that he could not see them at any time before the collision, although just after the collision, while the Bennett was aground as the result of the collision, the Newcastle range lights were visible. Nelson, the Bennett's lookout, says he saw the green side light of the Florence, and that he did not at any time see her red side light. Wick, who was at the Bennett's wheel, says he saw the green light of the Florence about two or

three points off the port bow of the Bennett; that, though he was constantly watching, he did not at any time see the red light of the Florence; that, after the Bennett had blown one blast of her whistle as a signal to the Florence that the Bennett intended to pass port to port, the Florence continued to show her green light; that the Bennett then gave a second signal of one blast which was followed by a cross-signal of two blasts from the Florence and the collision. Garmann, the Bennett's second mate, who was on the lower bridge, says he saw the green light of the Florence a couple of points off the Bennett's port bow when the Florence was two or three miles away, and that previous to the collision the Florence did not show her red light. Olsen, the Bennett's master, who was writing in the chart room, says that, after hearing the Bennett give a second signal of one blast, he jumped up and went out on the deck, heard the Florence give two blasts, and saw her two side lights off the Bennett's bow about a second or two before the collision, that the Bennett was on the Finn's Point range, and that the collision, with the hard-porting of the Bennett's wheel at that moment, threw the Bennett off the range, and forced her aground. Nelson also says the Bennett was "just about on the ranges" with "one light above the other." Wick says "we were on the ranges," and that the range lights were "in line with each other." Garmann says the Bennett was on the range and kept on it until the time of the collision, and that for four or five minutes before he saw the Florence the two range lights appeared one above the other. Olsen says that, when he came out of the chart room, he saw the Finn's Point range lights "one on top of the other, a little down to the westward, if anything, I should say." Later he said "the high light was a little to the eastward of the lower light, and we had them a little to the westward." Chambers admits that previous to sighting the Florence he had the ranges "slightly open to the westward," but that he then got on the ranges, and steadied the Bennett there. These are all of the witnesses who testified for the Bennett. On their testimony it is impossible to find that after the Florence was first sighted the Bennett remained on the westwardly side of the Finn's Point range lights. We cannot agree, therefore, with the conclusion of the learned district judge that the Bennett "was certainly to the westward in the channel, and was therefore not in her proper position." We do agree with his statement that "the decided weight of the evidence tends to the conclusion that the point of contact was close to the intersection and certainly was before either vessel had turned to follow the new range."

Our conclusions as to the essential facts are that up to the moment of the collision the Bennett had not left the Finn's Point range; that, though when the Bennett first sighted the Florence the former was slightly on the westwardly side of the line of the Finn's Point range lights, she immediately ported her helm and took her position on the line of the lights and remained there until the collision; that the Florence up to the time of the collision had not left the Newcastle range; that the Florence had continuously showed her green or starboard side light to the Bennett; that the Florence had continuously had the Bennett on her own starboard side; that the weight of the testimony completely overbalances Blocksom's uncorroborated statement that the

Bennett at any time showed both of her side lights to the Florence; that when the Brady, which was sailing the Newcastle range, came to the relief of the Florence, she found the Florence at or near the intersection without turning into the Finn's Point range, and that the collision occurred at or very nearly at the intersection of the two ranges. These conclusions, we believe, are supported by the clear weight of the evidence.

What, then, was the rule of the road applicable to the movements of the two vessels? Certain pilot rules are referred to in the opinion of the District Court. Congress, however, has established rules, and, if any of them is clearly applicable to the case, we need not invoke the aid of any pilot rule. The congressional act of June 7, 1897 (chapter 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2875]), has prescribed what are known as the "head and head, starboard hand, narrow channel, and overtaking rules." In the present case the head and head and the overtaking rules are clearly inapplicable. The Bennett contends that the starboard hand rule should be applied. That rule is founded on articles 19, 21, 22, and 23 of the act, which are as follows:

"Art. 19. When two steam vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse." U. S. Comp. St. 1901, p. 2883.

The argument of the Bennett is that, as she was on the starboard side of the Florence, she properly kept her course and speed, and that the Florence was at fault in not slackening her speed, or stopping or reversing her engine. The argument of the Florence seems to be to the effect that the narrow channel rule was applicable. That rule, which is defined by article 25 of the act, is as follows:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

It is immaterial which of the two rules be applied in this case. If the purpose of the Florence was to pass beyond the line of the Finn's Point lights before turning into the Finn's Point range, her intended course was across the course of the Bennett, and in that event it was her duty, under the starboard hand rule, to keep out of the way of the Bennett, and to cross that line under the Bennett's stern. If, on the other hand, it was not her purpose to cross the line of the Finn's Point lights, it was her duty to turn into the Finn's Point range so as to pass the Bennett port to port; that is, to observe the narrow channel rule. There is nothing in the record indicating that it was not safe or practicable for the Florence and the Bennett each to keep on her right hand side of the channel. Finding, as we do, that the Bennett was not where the Florence places her, but that she was on the line of the Finn's Point lights, each vessel knew that there was

a bend in the channel between them. Each knew that the other's course should follow the bend. In The Victory and The Plymothean, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, Chief Justice Fuller said:

"Indeed, the rule applicable when two vessels 'are crossing so as to involve risk of collision' that 'the vessel which has the other on her starboard side shall keep out of the way' is ordinarily inapplicable to vessels coming around bends in channels, which may at times bring one vessel on the starboard of the other. It has often been held as a general rule of navigation that vessels approaching each other in narrow channels, or where their courses diverge as much as one and one-half or two points, are bound to keep to port and pass to the right, whatever the occasional effect of the sinuosities of the channel."

Referring to the starboard hand rule, the Chief Justice also quotes from The Pekin, L. R. (1897) App. Cas. 532, as follows:

"The crossing referred to in article 22 is 'crossing so as to involve risk of collision' and it is obvious that, while two vessels in certain positions and at certain distances in regard to each other in the open sea may be crossing so as to involve risk of collision, it would be completely mistaken to take the same view of two vessels in the same positions and distances in the reaches of a winding river. The reason, of course, is that the vessels must follow, and must be known to intend to follow, the curves of the river bank. But vessels may no doubt be crossing vessels within article 22 in a river. It depends on their presumable courses. - If at any time two vessels, not end on, are seen, keeping the courses to be expected with regard to them respectively, to be likely to arrive at the same point at or nearly at the same moment, they are vessels crossing so as to involve risk of collision; but they are not so crossing if the course which is reasonably to be attributed to either vessel would keep her clear of the other. The question, therefore, always turns on the reasonable inference to be drawn as to a vessel's future course from her position at a particular moment, and this greatly depends on the nature of the locality where she is at that moment."

The Florence by the testimony of all her witnesses until she sighted the Bennett was on her starboard side of the channel. That was her proper side. The Bennett was justified in believing that she would remain on that side. Had she done so, the vessels would have passed port to port and, we are satisfied, in perfect safety. By her own testimony, however, it appears that the Florence gave a signal of two blasts (which the Bennett denies she gave until it was too late to avoid the collision), immediately starboarded her helm, and attempted to cross the bow of the Bennett. As said in The Pekin, circumstances may arise in which it is not improper for vessels to cross courses in narrow channels. In such cases the starboard hand rule is applicable. The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, was such a case. This was not. The Bennett was not on the Florence's side of the channel, and there is nothing to show that she knew or could have known that she was crossing the Florence's intended course. The narrow channel rule was as clearly applicable here, we think, as it was in Screw Collier Co. v. Webster, L. R. (1910) App. Cas. 165, where the House of Lords applied it to two vessels which collided in the Firth of Forth, and where Lord Gorell said:

"I think it is perfectly clear that the collision occurred in a narrow channel, and that it occurred on the north side of that channel, and then, when one finds that the Prudhoe Castle, the downcoming vessel, was on her wrong

side of the channel at the time of the collision under a starboard helm, it is very difficult to see how the primary blame of this collision should have been other than on the part of that vessel. Turning to the other ship—the Ruby—she would in her ordinary course come around the island with the lighthouse of which we have heard, and, following that course, would naturally get, if she followed it in the ordinary and proper way, to about the spot where this collision happened. In those circumstances it seems to me extremely difficult to impute any blame to her; and I agree with what the learned Lord President has said that she ought to be exonerated entirely."

The Florence was crossing the narrow channel with a starboard helm. We have above stated that we find upon the testimony in the case that the Bennett was not on the Florence's side. She was on the line of the Finn's Point lights. True, her proper position, under the narrow channel rule, was on her right-hand side of that line, and not directly on the line. Nevertheless, there was ample space for the movements of the Florence in her own starboard side of the channel. Had she not starboarded her helm, and attempted to cross ahead of the Bennett, there would have been no collision. The position of the Bennett directly on the line of the Finn's Point lights was not the proximate cause, or a contributing cause, of the collision. Had the Florence, on approaching the bend, ported her helm, as she should have done, all would have been well. The Bennett had no reason to suppose that the Florence would attempt to leave her proper side of the channel. In making the attempt she assumed all the risks.

The decree of the District Court is reversed, with costs against the Florence in this court. The record will be remanded with instructions to enter a new decree adjudging the Florence solely at fault, dismissing the libel against the Bennett, with costs, sustaining the libel against the Florence, and awarding against the Florence the damages sustained by the Bennett, with costs.